# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **::** | |
| | **::** | **CRIMINAL ACTION NO.** |
| **v.** | **::** | |
| | **::** | **1:14-cr-228-AT/AJB** |
| **JAMES BLOCKER** | **::** | |

## UNITED STATES MAGISTRATE JUDGE'S
## FINAL REPORT AND RECOMMENDATION

Pending before the Court are Defendant James Blocker's motions to suppress statements, [Doc. 36], and evidence, [Doc. 37].  For the following reasons, the Court **RECOMMENDS** that each motion be **DENIED**.

## I.  *Introduction*

A grand jury indicted Blocker for conspiracy to willfully infringe copyrights, in violation of 18 U.S.C. § 371, [Doc. 1].  After arraignment, Blocker moved to suppress evidence seized from his Rowlett, Texas home pursuant to a federal search warrant, [Doc. 37], as well as the statements he made at his home to the FBI during the execution of the search warrant at his home on August 21, 2012. [Doc. 36].  The Court held an evidentiary hearing on the statements, after which the parties filed briefs on both the statements, [Docs. 42, 46], and the search warrant, [Docs. 49, 50].

## II.    The search warrant

### A.    The search warrant affidavit

On August 20, 2012, Dallas, Texas-based FBI Special Agent Clyde Ellis, Jr.,[1] in the Northern District of Texas, applied for and received a federal search warrant for Blocker's home at 4009 Martha Lane, Rowlett, Texas. *See* Application and Affidavit for Search Warrant, and Search Warrant (Govt. Exs. 1 and 2); [*see also* Doc. 37-1]. The search warrant authorized the search of Defendant's residence and the seizure of documents, information, and records that constituted evidence of violations of 17 U.S.C. § 506 and 18 U.S.C. § 2319, relating to copyright infringement, and "17 U.S.C. §§ 2101 and 2104," relating to unauthorized circumvention of digital access controls. [Doc. 37-1 at 2].

Ellis' affidavit set out that the FBI was investigating the activities of several "warez" groups, which the affidavit defined as organized groups of individuals

---

[1]    Ellis averred that at the time of the application, he had been a FBI Special Agent for six years and was assigned to the Dallas Cyber Squad, which conducts investigations of intellectual property crimes including copyright infringement and computer crimes. His experience with the FBI included investigation of computer intrusions, copyright and trademark infringement violations, high-tech frauds and theft of trade secrets, and that he had participated in numerous investigations of these offenses. He received specialized training in the field of intellectual property rights and computer crimes. [Doc. 37-1 at 6]. He also related that he received information for this affidavit from FBI SA Kevin Orkin in Atlanta. [*Id.* at 7].

2

focusing on distributing and trading "warez," that is, copyrighted works which are reproduced or distributed in violation of copyright law, usually either for free or for deeply discounted rates, and that the money paid does not go to the copyright holder. [Doc. 37-1 at 8-9]. He further explained that after Google developed its Android operating system for mobile devices such as cell phones and tablet PCs, third-party developers designed and coded applications ("packages" or "apps"), ranging in subject matter from games to productivity, to run on the Android operating system, and these apps were available for free or for a fee for downloading to an Android device on "Google Play," f/k/a "Android Marketplace"; and that, by design, the end user of the app was precluded from direct access to the app package so that the user could not install the app on another device without paying for it. [*Id.* at 9-10]. Ellis also described how, despite these designed protections, software downloaded from the Internet allowed Android owners to customize their devices and gain "root access" to files and firmware on apps that were not intended to be accessible to the end user, and thereby circumvent a downloaded app's access- and/or copy-controls and gain unauthorized access to its source code; these actions allowed the transfer of the app free of charge and without authorization to other Android devices or to warez groups. [*Id.* at 11].

3

One of the warez groups investigated was Appbucket; it had a website Appbucket.net, and it created an Android app known as Appbucket.apk that allowed users to search for other Android apps and download them without paying the fee associated with these apps on the Android Marketplace. [*Id.* at 10]. For this service, Appbucket charged users either an annual fee of $9.99 or one-time fee of $49.99. [*Id.*]. The affidavit related how subscriptions to Appbucket were processed through Digital River, a payment processor, and that Appbucket also generated income by selling advertisements on its webpage. The affidavit also related that Appbucket offered apps for download, that Appbucket and its group members were not affiliated with the Android Marketplace, and that its website promoted itself as " 'the premiere alternative Android market!' " [*Id.* at 10, 11].

The affidavit further recounted that on March 1, 2012, an undercover FBI employee signed up for an Appbucket account and received a confirming email which stated, in part, that "[w]e provide the android community with tons of PAID android apps. All our apps are cracked, working, and of course paid apps!  After you have registered head over to the Pricing and Plans page to pick a subscription so that you can start downloading." [*Id.* at 12 (paragraph breaks altered)].

4

Although in late July 2011 an undercover FBI employee ("OCE") initially was unsuccessful in subscribing to Appbucket, in response to emails to Appbucket customer service, the individual made himself available via telephone. The Appbucket customer service email address had an IP address of 208.54.85.238, part of a larger IP block assigned to T-Mobile, and was associated with a Facebook account named "Andy Appbucket." On July 28, 2011, the OCE received a telephone call from 407-334-8336, and the caller identified himself as "Andy from Appbucket," and proceeded, through his mobile phone, to help the OCE upgrade his Appbucket account to allow for downloading of unauthorized copyrighted files from Appbucket. [*Id.* at 13]. The phone number, also serviced by T-Mobile, was assigned to Nicolas Narbone in Orlando, Florida. T-Mobile was unable to tell the FBI who subscribed to IP address 208.54.85.238. [*Id.* at 14].

Ellis went on to state that on February 3, 2012, FBI OCEs bought 1,494 copyrighted Android applications from Appbucket, with a total retail value of $4,386.94. [*Id.*].

Digital River, the payment processor for Appbucket, listed Narbone, at an address in Orlando, Florida and phone number 407-334-8336, as the subscriber information for Appbucket; and also listed other "authorized users" of Appbucket's

5

Digital River account, including "James Blocker," who was further identified by login name of "jrblocker" and an email address of "dev@appbucket.net." [*Id.*]. Digital River's access logs showed "jrblocker" accessing Appbucket's merchant account numerous times. [*Id.*].

The affidavit next explained that Appbucket previously used PayPal to process payments, and the name, address and phone number associated with the account were the same as for Digital River, that is, Narbone's. Paypal's records showed that more than $120,000 in payments were made to Narbone's account "primarily for the purpose of subscription service to the websites Narbone has run providing copyrighted Android material," and that between June and December 2010, Narbone sent 30 payments, totaling $7,222.63, to the Paypal account jrblocker78@gmail.com. [*Id.* at 15].

Ellis also explained that in February 2011, the FBI learned that Applanet was another warez group in competition with Appbucket, that it was actively sharing copyrighted works for free via an application it was distributing on the website www.applanet.net, and that it maintained a presence on Facebook to communicate with its members. [*Id.* at 12]. Ellis then related that a search warrant on the email address associated with a person doing coding for Applanet contained a chat transcript between that person and account "jrblocker78," discussing a planned merger between Applanet

6

and Appbucket.  [*Id.* at 15-16].  The FBI traced the "jrblocker78@gmail.com" email address to a Facebook account for "James Blocker" in Dallas, Texas, and the login IP history from Facebook included a login from IP address l73.64.216.11 on December 25, 2011; and Verizon's subscriber information for that address was James Blocker, 4009 Martha Lane, Rowlett, TX, e-mail address: jrblocker78@gmail.com, user name: whit3fir3.  [*Id.* at 16].  Both that G-mail account and "whit3fir3" were used by "jrblocker78" in the chat with the Applanet coder.  [*Id.* at 15].  Google provided Blocker's former address in Mesquite, Texas as associated with that G-mail account.  [*Id.* at 17].  A March 30, 2011 email for login account information for an appbucket.net account was sent from dev@appbucket.net to Applanet's administrator and was signed "wht3fir3."  Further, a pen register on the Verizon account associated with 4009 Martha Lane, Rowlett, Texas reflected through August 14, 2012, "numerous accesses" to the Appbucket server on administrative ports not used by ordinary Appbucket users.  [*Id.*].

### B.    *Arguments of the parties*

In his motion to suppress, Blocker argues that the affidavit did not establish probable cause that any federal law was violated because it did not establish that any copyrighted works had been stripped of their digital access controls or that the

7

developers of any copyrighted works were not fairly compensated by Appbucket. [Doc. 37 at 2]. He argues that because the affidavit did not establish a single copyrighted work that was available through Appbucket and then sold in an unauthorized manner or was stripped of its digital access controls, the warrant was not supported by probable cause. [*Id.* at 2-3].

Blocker also argues that there was insufficient evidence that his residence would contain evidence of a crime, and that his access to a server established any likelihood that his residence contained evidence of a crime, or that he was in possession of any works in violation of copyright laws. [*Id.* at 3]. He also argues that the seizing agents inadequately documented what they seized. [*Id.* at 3-4].

In response to the Court's order for more briefing, [Doc. 48], the government first points out that the warrant application and the warrant incorrectly cited to the Digital Millennium Copyright Act ("DMCA") as codified at 17 U.S.C. §§ "2101and 2104" instead of the correct citation, 17 U.S.C. §§ 1201 and 1204. [Doc. 49 at 5 n.4]. It then argues that the warrant was supported by probable cause. In support, it contends that it can show a violation of the copyright statutes in a number of ways, including the reproduction or distributing of a copyrighted work without the owner's permission during any 180-day period, which has a total retail

8

value of more than $1000.  [*Id*. at 7 (citing 17 U.S.C. § 506(a)(1)(B);

18 U.S.C. § 2319(c)(3))].  It then argues that failing to show that any app developers

were not compensated by Appbucket is irrelevant since to prove a violation of

§ 506(a)(1)(B), the government need not prove that the developers were not

compensated. [*Id*. at 8].  As for Blocker's argument that the affidavit failed to identify

even one copyrighted work, the government argues that was unnecessary since the

affidavit describes how the OCEs downloaded 1,494 copyrighted works from

Appbucket with a retail value of $4,836.94, and other facts in the affidavit make clear

that AppBucket distributed these apps without permission of the copyright holders.

[*Id*. at 9].  For example, the affidavit described Appbucket as a warez group and

identified itself as the " 'premiere alternative Android market' " and that it provides

" 'the android community with tons of PAID android apps.  All our apps are cracked,

working, and of course paid apps!' "  [*Id*. (quoting [Doc. 37-1 at 9, 11-12,

¶¶ 5G, 16-17])].

The government next argues that summarizing the results of the download as

opposed to listing one or more of the 1,494 copyrighted works is allowed under

Eleventh Circuit precedent, namely *United States v. Jiminez*, 224 F.3d 1243, 1248-49

(11th Cir. 2000).  [*Id*. at 10].  The government points out that in *Jiminez*, the court found

probable cause based on the affiant's summarization of intercepted wiretap calls, holding that the affidavit summarized information gained through the wiretap by stating that the " 'conversations indicate that various drug activities were taking place; this is an objective presentation of the information gained by the investigating officers.' " [*Id.* (quoting *Jiminez*, 224 F.3d at 1248-49) (punctuation altered)]. It further argues that the information provided in the instant affidavit was more detailed than in *Jiminez*, because Ellis told the issuing judge (1) the type of copyrighted work infringed (Android apps); (2) the date on which FBI OCEs downloaded copies of copyrighted apps from Appbucket; (3) the exact number of copies of copyrighted apps that were downloaded on that date (1,494); and (4) the precise value of those copyrighted apps ($4,836.94). [*Id.* at 11]. The government argues that since the affidavit also showed that Appbucket marketed itself as "the premiere alternative Android market" providing its customers with "cracked, working, and of course paid apps!,' " this was more than enough basis for the issuing judge to find probable cause of a copyright violation. [*Id.* at 11-12].

The government alternatively argues that if probable cause was lacking, the good faith exception under *United States v. Leon*, 468 U.S. 897, 926 (1984), prevents suppression of the fruits of the search. [*Id.* at 12]. It argues that the affidavit was not

the sort of "bare-bones" statement of probable cause that would render the exception inapplicable. [*Id.* at 14].

The government next argues that the affidavit established a nexus between Blocker's home and the evidence sought to be seized. In support, it contends that the affidavit set out sufficient facts to show that a computer from his residence contacted the Appbucket server on administrative ports not used by ordinary Appbucket users. [*Id.* at 15-16].

Finally, the government argues that suppression is not called for on the basis of an allegedly incomplete inventory. [*Id.* at 16]. It first contends that that is an evidentiary matter to be taken up at trial as an issue of chain of custody, and thus is a premature objection. [*Id.*]. It also argues that the courts have held that the failure to complete an inventory is not grounds for suppression unless a constitutional violation has been shown and the defendant can show prejudice, neither of which have been demonstrated in this case. [*Id.* at 17].

In reply, Blocker for the first time cites the incorrect statutory citations as grounds for suppression. [Doc. 50 at 1-2]. He also argues that the affidavit was insufficient to allow the issuing magistrate judge to issue the warrant because it did not establish that the 1,494 copyrighted Android apps bought were stripped of digital rights

11

management without authorization under the DMCA or downloaded or copied in violation of any copyright. [*Id.* at 2]. He argues that the affidavit essentially alleges that " 'we believe these applications to be violating copyright and DMCA laws' without providing any factual basis for that suspicion." [*Id.* at 3]. While conceding that the affidavit did not need to mention by name any specific copyrighted work, he contends that the affidavit needed to provide some basis to conclude that the works were copied without the copyright owner's consent or the access controls were stripped without permission, neither of which were shown here. [*Id.*]. He submits that the "additional information" that the government contends the affidavit contained, did not demonstrate either of these two necessary facts. [*Id.* at 2-3 (citing [Doc. 49 at 11])]. He further contends that the email sent out by Appbucket after registration that "[a]ll our apps are cracked, working, and of course paid apps!" is not sufficient because there was no allegation that the access controls were removed without the owner's consent. [*Id.* at 4 (quoting [Doc. 37-1 at 7])]. He argues that no copyright owner was contacted to determine if the work was allowed to be downloaded through Appbucket, and that it is possible that the copyright owners consented to have their works distributed. [*Id.*].

Blocker also argues that the good faith exception does not apply because it was unreasonable for the executing officers to rely upon it since they did not determine

whether any of the works were downloaded in violation of the copyright or DMCA laws.  [*Id.* at 5-6].  He also quoted Justice Brennan's dissent in *Leon* in support of his argument that to allow the government to use evidence seized in violation of the Constitution is improper.  [*Id.* at 6-7 (quoting *Leon*, 468 at 934-35 (Brennan, J., dissenting)].  He did not address the government's arguments about nexus or the inventory.  [*See id., passim*].

### C.    Discussion

#### 1.    Applicable law

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  Thus, " '[t]he Fourth Amendment demonstrates a strong preference for searches conducted pursuant to a warrant.' "  *United States v. Bell*, 588 Fed. Appx. 875, 877 (11th Cir. Oct. 7, 2014) (quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996) (quotation omitted)).  Search warrants are presumed to be validly issued.  *Franks v. Delaware*, 438 U.S. 154, 171 (1978); *United States v. Gamory*, 635 F.3d 480, 490 (11th Cir. 2011).  The burden of establishing that the

13

warrant in this case was defective or executed improperly is upon the defendant. *Franks*, 438 U.S. at 171; *United States v. Van Horn*, 789 F.2d 1492, 1500 (11th Cir. 1986); *United States v. Marx*, 635 F.2d 436, 441 (5th Cir. Unit B 1981)[2]; *United States v. Osborne*, 630 F.2d 374, 377 (5th Cir. 1980).[3]

For a search warrant to be valid, it must be supported by probable cause. *United States v. Leach*, 498 Fed. Appx. 915, 916 (11th Cir. Nov. 21, 2012) (citation omitted). Probable cause to support the issuance of a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location. *See United States v. Noriega*, 676 F.3d 1252, 1261 (11th Cir. 2012); *United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009); *United States v. Gonzalez*, 940 F.2d 1413, 1419 (11th Cir. 1991). The federal search warrant affidavit must set forth facts upon which the issuing judge can find probable cause that a federal crime is involved. *United States v. Miller*, 24 F.3d 1357, 1360 (11th Cir. 1994).

---

[2]     The Eleventh Circuit has adopted as binding all decisions issued by a Unit B panel of the former Fifth Circuit. *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).

[3]     In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

14

"[P]robable cause is a fluid concept--turning on the assessment of probabilities in particular factual contexts[.]" *Illinois v. Gates*, 462 U.S. 213, 232 (1983); *United States v. Brundidge*, 170 F.3d 1350, 1352 (11ᵗʰ Cir. 1999).  "[P]robable cause deals 'with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' "  *Gates*, 462 U.S. at 241 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).  Moreover, "[p]robable cause does not require overwhelmingly convincing evidence, but only 'reasonably trustworthy information.' "  *United States v. Angulo-Hurtado*, 165 F. Supp. 2d 1363, 1376 (N.D. Ga. 2001) (quoting *Ortega v. Christian*, 85 F.3d 1521, 1524 (11ᵗʰ Cir. 1996)).  Yet, an affidavit will be found deficient if it contains merely conclusory allegations and fails to provide sufficient information in order for the judge to conclude "that evidence or contraband will probably be found at the premises to be searched."  *United States v. Martin*, 297 F.3d 1308, 1314 (11ᵗʰ Cir. 2002) (internal quotation marks omitted).  That is, conclusory statements in a search-warrant affidavit that do not have sufficient factual support will not sustain a probable-cause finding.  *Gates*, 462 U.S. at 239 ("Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of

15

others.  In order to ensure that such an abdication of the magistrate's duty does not occur, courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued.").

The task of the issuing magistrate judge in determining whether to issue a warrant "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit [ ], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Gates*, 462 U.S. at 232; *United States v. Jiminez*, 242 F.3d 1243, 1248 (11th Cir. 2000); *see also United States v. Somers*, 591 Fed. Appx. 753, 756 (11th Cir. Nov. 14, 2014). In deciding whether to issue a search warrant, the issuing judge may rely upon the opinions and conclusions of an experienced law enforcement agent-affiant, *United States v. Robinson*, 62 F.3d 1325, 1331 n.9 (11th Cir. 1995), since "[c]onduct innocent in the eyes of the untrained may carry entirely different 'messages' to the experienced or trained observer."  *United States v. Gonzalez*, 969 F.2d 999, 1004 (11th Cir. 1992) (quoting *United States v. Fouche*, 776 F.2d 1398, 1403-04 (9th Cir. 1985)); *see also United States v. Kirk*, 781 F.2d 1498, 1505 (11th Cir. 1986) ("Observations of fellow

16

officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number.") (citations omitted).

Finally, "probable cause must exist when the magistrate judge issues the search warrant," *United States v. Santa*, 236 F.3d 662, 672 (11th Cir. 2000) (quoting *United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994)), because a search is not to be made legal by what it turns up. *United States v. Di Re*, 332 U.S. 581, 595 (1948).

Then, the task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate judge's decision to issue the warrant, *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984), affording "great deference to judicial determination of probable cause to issue a search warrant." *Robinson*, 62 F.3d at 1331 (citing *Gonzalez*, 940 F.2d at 1419). Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations. *Gates*, 462 U.S. at 236-37 (citing *United States v. Ventresca,* 380 U.S. 102, 109 (1965)); *see also Miller*, 24 F.3d at 1361 (same). As the Supreme Court has instructed, "[a]lthough in a particular case it may

not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *Upton*, 466 U.S. at 734 (quoting *Ventresca*, 380 U.S. at 109).

## 2.   *Analysis*

The Court concludes that the search warrant was supported by probable cause that one or more federal crimes had been or were being committed and that evidence of those crimes would be located in Blocker's home.[4]

---

[4]   The Court rejects Blocker's argument that the warrant was defective for citing to the wrong DMCA code sections.  First, the argument was raised for the first time in a reply brief.  *See Rindfleisch v. Gentiva Health Servs., Inc.*, 22 F. Supp. 3d 1295, 1301 (N.D. Ga. 2014) (Jones, J.) ("[F]ederal courts do not consider arguments that are presented for the first time in a reply brief.").  Second, the incorrect citation to the code section does not detract from the existence of facts demonstrating that there was probable cause to believe that evidence of a federal offense would be located at Blocker's residence.  *United States v. Clements*, 588 F.2d 1030, 1036 (5th Cir. 1979) (finding that wiretap warrant was valid even though anti-gambling statute referenced in affidavit had been repealed, since gambling still violated state law under different, uncited statute); *Proescher v. Bell*, 966 F. Supp. 2d 1350, 1368 n.15 (N.D. Ga. 2013) (Duffey, J.) ("That Bell may have mis-executed the affidavit, which cited the wrong code section, does not discredit that Bell had probable cause to believe that Plaintiff had committed the crime of criminal trespass by not leaving the Park as directed at the time Bell executed the affidavit.").  Third, the affidavit stated the correct statutes on multiple occasions.  [Doc. 37-1 at 6,12].

18

In order to violate the criminal copyright laws, a person must willfully *inter alia* infringe a copyright for purposes of commercial or private financial gain, or reproduce or distribute, including by electronic means, during any 180-day period, one or more copyrighted works which have a total retail value of more than $1,000.  17 U.S.C. § 506(a)(1)(A), (B).  In order to criminally violate the DMCA, a person must willfully circumvent a technological measure that effectively controls access to a work.  17 U.S.C. §§ 1201, 1204.  In this case, the affidavit demonstrated that apps in violation of the owner's copyright were being unlawfully distributed through Appbucket's website, amounting to probable cause as to each criminal copyright subsection, and also that the access controls to the apps had been circumvented.

Ellis' affidavit explained that warez groups unlawfully distributed copyrighted works for free or a reduced rate, and that Appbucket was one such group.  He explained that Appbucket.apk allowed users to search for Android apps and download them without paying the fee associated with these apps on the Android Marketplace, and, instead, Appbucket charged its subscribers a fee of either $9.99 per year or a one-time fee of $49.99.  The subscription registration fee demonstrates that Appbucket was engaging in selling apps for commercial advantage or private financial gain.

19

Ellis also related that Android device owners could download software to customize their devices in order to gain "root access" to the software controlling the app, and thereby redistribute the app to another device or upload it to a warez group's website for further unauthorized distribution, which action explains one likely way how Appbucket obtained Android Marketplace apps. He also related that Appbucket was not associated with the Android Marketplace. The import of these facts, in addition to Appbucket's claim of being an "alternative" to the Android Marketplace, is to demonstrate that Appbucket was selling apps that usually are only for sale through the Marketplace, but because controls have been "rooted" out from these apps, they are available for sale through Appbucket.

Moreover, in this case, after signing up with Appbucket, the FBI OCE was welcomed to "the premiere alternative Android market!" and told that it had "tons of PAID android apps" which were "cracked, working, and of course paid apps!" This latter exclamation ("cracked")–in Appbucket's own words–reasonably was meant to convey that the security provisions of the apps had been circumvented in an unauthorized way. *See Murphy v. Millennium Radio Group LLC*, 650 F.3d 295, 300 (3d Cir. 2011) (in discussing § 1201 of the DMCA, 17 U.S.C. § 1201(a), stating "[t]hus, for example, if a movie studio encrypts a DVD so that it cannot be copied

AO 72A
(Rev.8/8
2)

without special software or hardware, and an individual uses his own software to '*crack*' the encryption and make copies without permission, the studio may pursue the copier both for simple infringement under the Copyright Act and, separately, for his circumvention of the encryption, which is a 'technological measure' designed to 'control . . . access to' the DVD, under the DMCA") (emphasis added); *Pac. Coast Marine Windshields Ltd. v. Malibu Boats, LLC*, No. 6:12-CV-33-ORL-28DAB, 2012 WL 10817204, at *7 (M.D. Fla. Nov. 30, 2012) ("Mr. Holmes also determined that Gilbert's hard drive contained applications and files that had indications they were copied without authorization from DVD's or the internet, using software 'cracks' and software 'keygens'–commonly used to bypass, or circumvent software protection mechanisms the software vender may have put in place to protect their software against wrongful duplication or piracy."); *EchoStar Satellite LLC v. ViewTech, Inc.*, No. 07-CV-1273-BEN-WVG, 2011 WL 1522409, at *2 (S.D. Cal. Apr. 20, 2011) ("They collectively worked to *crack* Nagra 3 so that the computer code could be published on the internet, allowing Defendants' receivers to, once again, receive Plaintiffs' encrypted programming.") (emphasis added).

Similarly, this meaning of the term "cracked" in the case law is consistent with how the term "cracked" is used and understood in common parlance. Words used in

21

a search warrant application must be given common sense meaning in the context in which they are used. *Ventresca*, 380 U.S. at 108. Thus, for example, two national newspapers recently used the term "cracked" to describe circumventing software protections in cell phones. *See* Brian X. Chen, *Apps to Manage Passwords So They Are Harder to Crack Than 'Password'*, N.Y. Times Jan. 21, 2016, at B6 (available at http://www.nytimes.com/2016/01/21/technology/personaltech/apps-to-manage-passwords-so-they-are-harder-to-crack-than-password.html) (last visited Feb. 26, 2016); Ellen Nakashima, *Apple vows to resist FBI demand to crack iPhone linked to San Bernardino attacks*, Washington Post Feb. 17, 2016 (available at https://www.washingtonpost.com/world/national-security/us-wants-apple-to-help-unlock-iphone-used-by-san-bernardino-shooter/2016/02/16/69b903ee-d4d9-11e5-9823-02b905009f99_story.html) (last visited Feb. 26, 2016).

Moreover, the affidavit detailed how the "cracked" apps were being sold at below-market prices. Once the OCE was able to login into Appbucket, Appbucket then directed the customer to the pricing section of the website, which of course offered a subscriber the ability to download Android apps for little or no cost, as demonstrated by the fact that the OCE purchased almost 1500 apps with a retail price of almost $5,000 for either the $9.99 yearly fee or $49.00 one-time fee. Such below-cost offering

AO 72A
(Rev.8/8
2)

is some evidence that the distribution was in violation of the law.[5] *See United States v. Ndhlovu*, 510 Fed. Appx. 842, 847 (11th Cir. Feb. 25, 2013) (finding evidence sufficient to convict appellant where he sold counterfeit items at prices well below retail value, suggesting he knew they were not lawful copies); *cf. United States v. George*, 233 Fed. Appx. 402, 404-05 (5th Cir. June 22, 2007) (in trafficking in counterfeit drugs prosecution, evidence that drugs purchased were extremely inexpensive was evidence of defendant's knowledge or willful blindness that they were counterfeit); *United States v. Dais*, No. 91-5820, 1992 WL 14595, at *2 (4th Cir. Jan. 31, 1992) (unpublished) (noting that low prices of airline tickets should have suggested to defendant who purchased them that they were illegal).

The Court recognizes that the Supreme Court has counseled that "[a]n affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause" and that a "wholly conclusory statement" is insufficient. *See Gates*, 462 U.S. at 239. In *Gates*, for example, the Court held that a statement that "[the] 'affiants have received reliable information from a credible person and believe' that

---

[5]       The purchase of 1,494 apps for even the higher subscription rate of $49.99, is ridiculously cheap, even if one considers that some of these apps would be, if obtained directly through the Android Market Place, available for download for free. Likewise, having obtained so little money for the sale of the apps, it is unlikely that any of the proceeds were being remitted over by Appbucket to the copyright holder.

AO 72A
(Rev.8/8
2)

heroin is stored in a home" was too conclusory to establish probable cause. *Id.*; *see also Nathanson v. United States*, 290 U.S. 41, 47 (1933) (holding that a search warrant may not rest upon "mere affirmance or belief" without disclosure of supporting facts or circumstances). Obviously it would have been better if the warrant application had specifically identified some of the copyrighted and/or access-controlled works that were downloaded from Appbucket, but the totality of the circumstances described above demonstrates probable cause to believe that the items sold were in contravention of both the copyright laws and the DMCA. *Cf. United States v. Gallo*, 599 F. Supp. 241, 247 (W.D.N.Y. 1984) (denying motion to suppress although "[t]he affidavits never explicitly state that defendants are not bona fide distributors, but the whole theory of the affidavits is clearly that the copies were unauthorized"). Moreover, even Blocker acknowledges that the affiant did not have to specifically identify a copyrighted work. [Doc. 50 at 3 ("The affidavit need not mention by name any specific copyrighted work. . . .")].

Finally, the Court is aware of the Supreme Court's admonition that in marginal or close cases, the warrant is to be upheld. *Upton*, 466 U.S. at 734 (quoting *Ventresca*, 380 U.S. at 109). To the extent that the District Court concludes that this is such a case, this principal applies in this case.

AO 72A
(Rev.8/8
2)

As a result, the facts set forth in the affidavit, when taken together in viewed in the totality of the circumstances, demonstrate that the issuing judge had a substantial basis for concluding that probable cause existed, and thus the motion to suppress should be denied on this basis.

The Court also concludes that the issuing magistrate judge had a substantial basis for concluding that evidence of the crimes being investigated would be located in Blocker's residence. To make a showing of probable cause for a search warrant for a residence, the affidavit must demonstrate a nexus between the premises and both the alleged criminal activity and the defendant; it is not a requisite that the affidavit shows that illegal activity took place at the residence. *United States v. Piloto*, 562 Fed. Appx. 907, 913 (11th Cir. Apr. 10, 2014) (citing *Kapordelis*, 569 F.3d at 1310); *see also United States v. Bradley*, 644 F.3d 1213, 1263 (11th Cir. 2011) ("Probable cause to search a residence requires some nexus between the premises and the alleged crime."); *Martin*, 297 F.3d at 1314 (holding that the supporting affidavit "should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity").

Cases establish, however, that probable cause to search a home exists if the affidavit contains evidence that the defendant possesses evidence, including

25

contraband, that would typically be kept in the home.  *United States v. Anton*, 546 F.3d 1355, 1358 (11th Cir. 2008) (noting that, according to affidavit, federal agents had observed defendant with firearms at gun shows, and affidavit further stated that, based upon federal agent's experience, convicted felons and firearms dealers possessing contraband typically store these items on their property); *see also United States v. Jenkins*, 901 F.2d 1075, 1081 (11th Cir. 1990) (noting that affidavit stated that FBI agent, who had spent ten years investigating bank robbery and burglary matters, advised that defendant's resident was most likely hiding place of evidence of the theft); *United States v. Lockett*, 674 F.2d 843, 846 (11th Cir. 1982) ("[T]he nexus between the objects to be seized and the premises searched can be established from the particular circumstances involved and need not rest on direct observation.").

In this case, the affidavit detailed that email and IP addresses accessing portions of Appbucket's administrative functions not open to its customers were associated with Blocker at his residence.  Moreover, Blocker was listed as an authorized user of Appbucket's account at Digital River, the processor of payments to Appbucket. Further, Blocker was the recipient of moneys from Narbone through Appbucket's PayPal account.  Finally, his chat with an individual associated with Applanet, another warez group, during which Blocker described his new residence, provided ample

26

additional evidence that information concerning the aforementioned copyright infringement/DMCA violations would be at his residence and in his computers.  Thus, the fruits of the warrant should not be suppressed on this basis.

Third, an improper or incomplete inventory is generally not grounds for suppression of evidence.  Violations of Federal Rule of Criminal Procedure 41(f) "are essentially ministerial in nature and a motion to suppress should be granted only when the defendant demonstrates legal prejudice or that non-compliance with the rule was intentional or in bad faith."  *Marx*, 635 F.2d at 441; *see also United States v. Loyd*, 721 F.2d 331, 333 (11th Cir. 1983) ("[U]nless a clear constitutional violation occurs, noncompliance with Rule 41 requires suppression of evidence only where (1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule.") (citations omitted).  In *Marx*, the court held that failure to deliver a copy of the search warrant to the party whose premises were searched until the day after the search did not invalidate a search, in the absence of a showing of prejudice.  The *Marx* court went on to explain that in order to show prejudice in this context, a defendant must show that because of the violation of

Rule 41, he was subjected to a search that might not have occurred or would not have been so abrasive had the rule been followed. *Marx*, *id.*

The  defendant has the burden of establishing that the warrant in this case was defective or executed improperly. *Franks*, 438 U.S. at 171; *United States v. Van Horn*, 789 F.2d 1492, 1500 (11th Cir. 1986); *Marx*, 635 F.2d at 441; *United States v. Vigo*, 413 F.2d 691, 693 (5th Cir. 1969) (defendants have the burden of proof in challenging the validity of the execution or service of the search warrant).  In this case, Blocker has not demonstrated either that the allegedly incomplete inventory infringed on a constitutional right, nor has he shown how he has been prejudiced.  Also, the Court agrees with the government that his objections are premature, because he may challenge at trial the government's chain-of-custody for the evidence purportedly seized pursuant to the warrant.   Suppression is not warranted on this basis.

Fourth, and finally, even if the warrant was not supported by probable cause, the good faith exception saves the fruits of the warrant from suppression.  The Supreme Court has established a "good faith" exception to the exclusionary rule to prevent suppression of the items found pursuant to a search warrant.  Under *United States v. Leon*, 468 U.S. 897, 913 (1984), the "good faith" exception to the rule requiring the suppression of evidence for violations of the Fourth Amendment keeps evidence from

28

being suppressed when law enforcement officers obtain evidence through objective good faith reliance on a facially valid warrant that is later found to lack probable cause. *See Gonzalez*, 969 F.2d at 1004 n.4.    Nevertheless, "it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Leon*, 468 U.S. at 922-23.  *Leon*'s good faith exception does not apply to the following situations: (1) where the magistrate judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate judge wholly abandoned her judicial role; (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient – *i.e.,* in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid.  *United States v. Robinson*,  336 F.3d 1293, 1296 (11th Cir. 2003).  Under *Leon*'s third exception, the affidavit must not be a "bare-bones" statement containing nothing more than conclusory allegations.   *See Leon*, 468 U.S. at 915; *United States v. Glinton*, 154 F.3d 1245, 1257 (11th Cir. 1998).

AO 72A
(Rev.8/8
2)

The government bears the burden of demonstrating the applicability of the *Leon* good faith exception. *See United States v. Travers*, 233 F.3d 1327, 1331 n.2 (11th Cir. 2000).

The Court rejects Blocker's arguments that the *Leon* good faith exception does not apply in this case. First, as to Blocker's argument based on Justice Brennan's dissent in *Leon*, this Court is not free to decide whether or not to follow the binding precedent of higher courts. *Jaffree v. Wallace*, 705 F.2d 1526, 1532 (11th Cir. 1983) ("Federal district courts and circuit courts are bound to adhere to the controlling decisions of the United States Supreme Court."). And, a dissenting Supreme Court opinion is not binding precedent. *Purcell v. BankAtlantic Fin. Corp.*, 85 F.3d 1508, 1513 (11th Cir. 1996) (citing *United States v. Goodrich*, 871 F.2d 1011, 1013 (11th Cir. 1989)). Therefore, Justice Brennan's dissent provides no basis for the Court to categorically reject *Leon*'s applicability to this case.

Second, turning to the merits of the *Leon* issue, the parties agree that only *Leon*'s third exception is relevant to this case. In that regard, the Court does not find that the affidavit was so lacking in probable cause as to render official belief in its existence entirely unreasonable. *Robinson*, 336 F.3d at 1296. As set out *supra*, this affidavit presented much more than conclusory, "bare-bones" assertions for consideration by the issuing magistrate judge. The affidavit showed, among other things, (1) the purpose

30

and operation of warez groups, (2) the pricing structure of an Appbucket subscription, (3) Appbucket's own declarations as to what products it offered, (4) the extremely low price paid for the 1,494 apps purchased, which demonstrated the likelihood that the apps Appbucket offered were unlawfully pirated, and (5) a detailed roadmap as to how Blocker was affiliated with Appbucket and why evidence of Appbucket's activities likely would be located in his home.  These factual details for the magistrate judge to consider and evaluate rendered the affidavit not conclusory or bare-bones.  Thus, the agents were entitled to rely upon the issuing judge's evaluation and determination that "given all the circumstances set forth in the affidavit before h[er], there [was] a fair probability that contraband or evidence of a crime [would] be found in a particular place." *Gates*, 462 U.S. at 238.  As a result, even if the affidavit lacked probable cause, suppression is not warranted due to the application of the *Leon* good faith exception.

For all of the above reasons, the undersigned **RECOMMENDS** that Blocker's motion to suppress evidence, [Doc. 37], be **DENIED**.

### III.  *The execution of the warrant and questioning of Blocker*

#### A.  *Facts*

The warrant was executed at approximately 6:00 a.m. Central Time on August 21, 2012.  T6, 31.  It was still dark outside.  T31; *but see* T106 ("little bit of

31

daylight"). The executing team was comprised of nine FBI Special Agents and three support personnel (evidence custodians and a photographer) and a uniformed local police officer in a marked unit. T6, 64, 66. Blocker's home was a detached single family two-story home. T7. Two agents were posted on the rear perimeter of the home, and four or five agents approached the front of the home. T7. On the front perimeter were Ellis and Atlanta-based FBI Special Agent Cyrus Riley; Riley stood behind a vehicle parked in the street about 15 to 20 yards away from the house, and Ellis was some distance away from him. T7-8, 64, 67, 99. All of the Special Agents wore bullet-proof vests identifying themselves as FBI agents and tactical cargo pants, and each possessed a Glock pistol. T8, 67, 68. Two of the agents at the door had MP5 assault rifles ("long guns") and one had a shield. T8, 34-35. There also was a ram and a breach tool. T68. Ellis testified that this protocol was typical for every search warrant execution by the Dallas FBI office, even where the target is a computer coder. T69, 96.

Prior to executing the warrant, the agents knew that Blocker was a computer programmer, with no criminal record and no history of violence. T37. However, they

32

approached the house with their weapons drawn,[6] and then knocked.  T9, 35, 38.  It took one to two minutes before Blocker came to the door.  T9, 100 (Ellis describing the time for Blocker to open the door as not long).  The agent with the shield and another with the assault rifle were at the door.  T36.  All of the agents' weapons were pointed at Blocker.  T35, 105.  Blocker was advised "FBI, get your hands up,"[7] and he complied while still standing in his home.  T39.  It looked like Blocker had just woken up.  T47.  He was physically taken out of the home, and the house was cleared.  T9, 70, 102, 103-04.  Once Blocker complied with the executing agents' commands, the agents lowered their weapons.  T35.  He was brought ("passed back") to a point near the street where Riley and Ellis were standing, by an agent guiding his elbow.  T9-10, 49, 101.  Neither Riley nor Ellis could recall if Blocker was placed in handcuffs.  T10, 11, 70, 75.  The agents also could not recall how Blocker was dressed, T11, 71, but Riley later acknowledged in response to the Court's questions that he was wearing a t-shirt (and possibly shorts) and was barefoot.  T47, 118.  Blocker asked Riley what the hell was

_____

[6]     Although Ellis stayed back from the entry team, he also drew his weapon. T72.

[7]     Ellis testified that the knocking agents yelled "FBI. Search warrant." T69, 100.  Although Ellis testified with more certainty and better recall than Riley, where the agents' testimony conflicts, the Court credits the testimony most favorable to Blocker.

33

going on, and Riley responded that he preferred to wait until they got into the house to discuss things, although he may have told him they had a search warrant.  T10, 49-50. He did not advise Blocker at that time about his status.  T19.[8]  Ellis did not have any conversation with Blocker at this time.  T72.  Riley described Blocker as agitated at first, and Riley had to tell him that the agents' actions were a safety issue, but then he calmed down.  T19, 20, 50.  Riley is sure that at some point he was patted down, but he did not recall when.  T48; *see also* T117.

It took the entering agents four to five minutes to clear the house.  T12.  Riley removed his raid vest.  T13, 41.  Once cleared, the kitchen was photographed and Blocker was told that they were going to go into the house and discuss the reasons why the agents were there.  T51.  He was escorted into the house by another agent and taken to the kitchen.  T13, 14.  At all times, Blocker was in the company of at least one FBI agent.  T75.  However, there is no evidence that once inside the kitchen, that Blocker was touched at all by any agent.  T75.  Ellis, who had gone back outside to remove his raid vest and get a notepad, joined the escorting agent.  T41, 73, 76.  Once Ellis sat

---

[8]     Riley testified in response to the Court's question that he told Blocker at the street that he was not in custody.  T51.  The Court does not credit that testimony because Riley earlier testified that he did not discuss his status with Blocker while at the street.  T19.

down at the table, Blocker did as well.  T77.  Shortly thereafter, Riley joined them and the escorting agent left.  T15, 77.  From time to time, members of the searching team would enter the kitchen but primarily only Blocker and the two agents were present. T17.  The agents' weapons were visible but holstered.  T78.  The kitchen was a large room with a kitchen table with at least three exits.  T15-17; Govt. Exs. 3-5.

Since the case was being investigated out of Atlanta, Riley, the Atlanta agent on the scene, was the lead questioner.  T80.  Blocker was agitated and frustrated at first, and he wanted to know the reason the agents were there.  T80-81, 82 (Ellis describing Blocker's initial frustration as 10 on a 10-scale).  He did not appear to be under the influence of alcohol or drugs.  T92.

Riley told Blocker about the investigation into copyright infringement related to an alternative Android investigation, and that he (Blocker) had helped do some development on some of the applications, and that the agents needed to get some questions answered about his role in the development as well as his knowledge of other individuals who helped develop the application.  T19, 20.  Riley showed him the search warrant.  T50.  Riley told him he was not in custody, he was free to leave, and did not have to answer questions.  T21-22, 45, 81, 82 (Ellis describing Riley's advice as not having to talk to them if he did not want to), 109 (Ellis describing the advice as he did

35

not have to answer questions), 123 (Ellis testifying that Riley told Blocker he was not under arrest). Blocker was cooperative in that he listened to what Riley was saying. T20. Riley did not advise him of his *Miranda* rights. T22, 82. After the beginning of the interview, Blocker calmed down, T81, particularly after Riley began to talk to him about Narbone. T83; *see id.* (Ellis describing Blocker's frustration level dropping from 10 "to about a 5, to about a 1"). Ellis further described Blocker as willing to talk about Narbone. *Id.*; *see also* T120 (Ellis testifying that when Blocker was questioned about Narbone, he began to answer questions more freely).

Riley asked most of the questions. T81. Blocker had a degree in computer science. T22. He spoke to the agents about his role in the development of the alternative Android market and his relationship to others working on the project. T23. He appeared to want to help. T23.

Once in the kitchen, Blocker was not handcuffed, not touched by the agents, nor did he ask to leave. T22, 24, 83-84. After the initial entry, no weapons were drawn by any of the agents. T24, 82. Blocker did not ask the agents to leave or indicate that he wanted to terminate the interview, nor did he state that he wanted to talk to a lawyer. T24-25, 84-85. However, when Blocker needed to use the restroom, he was escorted and the door was kept open. T41-42, 56-57, 94-95. Midway through the interview, he

36

was given a drink. T55, 85. No threats were made to him. T86. Although both agents testified that Blocker was free to leave, he was not allowed to be alone in his home. T109; *see also* T121 (Ellis acknowledging that they really did not want him to leave).

Although Riley testified that no voices were raised during the questioning, there was some tension on Blocker's part because he objected to being deprived of his cell phone. T24, 43; *see also* T86. Although Blocker was calm during the interview, he became agitated when he realized the agents were going to be taking some of his things, but not to the point of belligerence, T43-44; however, an arrangement was worked out that the Dallas field office would take the phone to search and return it in a reasonable time. T24.

Although Riley described Blocker as calm and cooperative, and testified that Blocker burned discs containing Appbucket source code and gave passwords for encrypted computers, T27-28, 87-88, *see also* 115 (Ellis testifying that Blocker was asked about passwords and gave them), he also testified that Blocker "became more forthright" after he was shown printed out copies of certain emails. T54-55. Blocker answered all of the questions posed to him. T87. Ellis testified that Blocker offered to make the discs for the agents. T89. The burning of the discs did not take long. T108. He also gave the agents the number to another cell phone through which they

37

could reach him. T28. The interview ended when Riley ran out of questions that had been provided him by the FBI case agent in Atlanta. *Id.* By that point, the searching agents were completing the cataloguing and photographing of evidence. T29. The last thing the agents did before they left was provided an inventory to Blocker of what was seized. T91-92.

Riley testified that the interview lasted only two hours, T23, while Ellis testified that it lasted 45 minutes to one hour. T83. These approximations are belied by the other evidence in the record. Riley testified that the agents left Blocker's home between 10:30 and 11:00 a.m., and he acknowledged that the interview, which began around 6:30 a.m. could have lasted longer than two hours. T12.

Riley had additional contact with him telephonically to arrange for another agent to return his cellphone and a computer that Blocker needed. T29, 116.

**B.     Arguments of the parties**

Relying upon *United States v. Cavazos*, 668 F.3d 190 (5th Cir. 2012), Blocker argues that he was effectively in custody and thus entitled to *Miranda* warnings. [Doc. 42 at 4, 5]. He contends that (1) he was awoken at 6:00 a.m. to the loud knocking and yelling of FBI agents, and opened the door to his home to find assault rifles and pistols pointed at him as well as a riot shield, a battering ram, and at

38

total of twelve law enforcement officers in bulletproof vests; (2) agents brought him out of the house and passed him off to another agent while they entered his home, and they then brought him into his kitchen to question him; (3) although it is unclear in the minds of the agents, he may have been handcuffed initially and then was not in handcuffs in the kitchen; (4) two agents questioned him without advising him of his *Miranda* rights; (5) agents escorted him to the restroom and observed him while he relieved himself; (6) agents seized his cell phone during the search and it appears that he was not allowed to make or receive any phone calls; and (7) the interview was excessive in length, lasting between two to four hours. [*Id.* at 6-7]. He argues that under the totality of the circumstances, a reasonable person would not believe that he was at liberty to terminate the interrogation and leave, and that just as in *Cavazos*, while the agents may have informed him that the interview was non-custodial, such fact is not dispositive. "Here, a normal citizen with no criminal history whatsoever was subjected to an excessive use of force by the Agents such that any reasonable person in his position would not have felt free to terminate the interrogation and leave." [*Id.* at 7-8]. He argues that the circumstances in this case were more oppressive than those in *Cavazos*, as the interview lasted for more than two hours. [*Id.* at 7]. Finally, he argues that the agents know he was just a computer programmer with no criminal history, and

39

had not concerns about his destroying evidence, but they conducted a SWAT-style raid that was an excessive display of force that would put any reasonable person in fear of his safety. Because he was in custody and not *Mirandized*, he seeks the suppression of his statements. [*Id.*].

In response, the government argues that Blocker did not satisfy his burden of demonstrating that he was in custody. In support, it first contends that he was interviewed in his own house, a location the courts have found less likely to demonstrate a custodial interrogation. [Doc. 46 at 7-8 (citations omitted)]. Second, the government points out that the agents told him he was not under arrest and did not have to answer their questions, another fact that the courts rely upon in concluding the interview was not custodial. [*Id.* at 8-9 (citations omitted)]. It also argues that the fact that the agents used plain language to advise him that he was not in custody and did not have to answer questions distinguishes this case from *Cavazos*, where the agents told the suspect that it was a "non-custodial interview," a term the court stated did not convey to a lay person that he could terminate the interview and leave. [*Id.* at 10 (citing *Cavazos*, 688 F.3d at 192)].

Third, the government argues that there was no evidence that Blocker was ever in handcuffs or otherwise extensively restrained during the interview. While the agents

40

could not recall if he was initially in handcuffs, both agents recalled that he was not in handcuffs while being questioned.  [*Id.* at 11].  It additionally argues that the ambiguous testimony about the agents' recollections does not prove that he was in handcuffs.  [*Id.*].  The government also points out that this case is different than *Cavazos*, where the defendant was immediately handcuffed.  [*Id.* (citing *Cavazos*, 668 F.3d at 194)].

Fourth, the government also contends that any restraints placed on Blocker were minimal.  Although the evidence might support a finding that Blocker was barefoot, the government argues that the Eleventh Circuit has held that although such a fact weighed in favor of custody, it fell short of showing extensive restraint, [*id.* at 12 (citing *United States v. Brown*, 441 F.3d 1330, 1349 (11th Cir. 2006))], and, in any event, an even lesser restraint than in *Brown*, where the defendant's shoes were confiscated by the police.  [*Id.*].  The government also contends that the Eleventh Circuit has found no custody where a defendant did not have free rein of his home which was being searched by warrant.  [*Id.* at 12 (citing *United States v. Maldonado*, 562 Fed. Appx. 861; *United States v. Opoku*, 210 Fed. Appx. 848, 852 (11th Cir. 2006); and *United States v. Peck*, 17 F. Supp. 3d 1345, 1363 (N.D. Ga. 2014))].  It also contends that any minimal touching of the defendant by the agents guiding him first to Riley and then into the

41

kitchen did not constitute extensive restraints sufficient to show custody or transform the interview into a custodial interrogation.  [*Id.* at 12-13 (citing *United States v. Asher*, No. 1:09-CR-414-JOF-AJB, 2010 WL 4192883, at *10 (N.D. Ga. Feb. 25, 2010))].

The government also takes issue with Defendant's contention that he was not allowed to make phone calls as an overstatement of the testimony.  At the hearing, the agents could not remember whether Blocker asked to make a phone call, [*id.* at 13 (citing T59-60, 113-16)], and, moreover, presents another distinguishing fact from *Cavazos*, where the defendant's phone calls were monitored.   [*Id.* (citing *Cavazos*, 668 F.3d 194)].

Fifth, the government next argues that Blocker was not arrested at the conclusion of the search, demonstrating that there were minimal restraints placed upon him.  [*Id.* at 13 n.2 (citations omitted)].

Sixth, the government argues that the agents brandished their weapons only briefly when making initial entry into the home, and does not weigh in favor of a finding of custody.  [*Id.* at 14].  Seventh, the government contends that the discussion was for the most part cordial and conducted in normal tones, and they did not use language or tones that indicated that compliance could and the length of the interview did not exceed permissible standards.  [*Id.* at 15].

42

Eighth, although the government acknowledges that it is unclear how long the interview took place, [*id.*], it argues that because there is no fixed limit to the length of questioning, in considering the totality of circumstances, the interview was not custodial.  [*Id.* at 16 (citations omitted)].  Moreover, it contends that even if the interview lasted two to three hours, the interview was shorter than in other cases where the Eleventh Circuit has concluded the suspect was not in custody.  [*Id.* at 16-18 (citations omitted)].

The government also points out that Blocker did not address the voluntariness of his statements, but argues that there are no facts to suggest that his statements were not voluntary or that he was subject to official coercion.  [*Id.* at 18 n.5].

## C.    Discussion

The Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966), held that the Fifth Amendment requires "the exclusion of incriminating statements obtained during custodial interrogation unless the suspect fails to claim the Fifth Amendment privilege after being suitably warned of his right to remain silent and of the consequences of his failure to assert it."  *Minnesota v. Murphy*, 465 U.S. 420, 430 (1984).  *Miranda* does not apply, however, "outside the context of the inherently coercive custodial interrogations for which it was designed."  *Id.* (internal quotation marks omitted).

43

Thus, the right to *Miranda* warnings attaches when custodial interrogation begins. *United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004). *Miranda* itself held that pre-interrogation warnings are required in the context of custodial interrogations given "the compulsion inherent in custodial surroundings." *Miranda*, 384 U.S. at 458. The Court explained that "custodial interrogation" meant "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. However, as the Court noted in *Yarborough v. Alvarado*, 541 U.S. 652, 661 (2004), the *Miranda* decision did not provide the Court with an opportunity to apply that test to a set of facts. As those opportunities arose, the Court defined custody for the purposes of *Miranda* as a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotation marks omitted); *see also Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam); *New York v. Quarles*, 467 U.S. 649, 655 (1984); *United States v. McDowell*, 250 F.3d 1354, 1362 (11th Cir. 2001).

"[W]hether a suspect is 'in custody' is an objective inquiry." *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011); *see also Yarborough*, 541 U.S. at 663 (same). Thus, the actual, subjective beliefs of the defendant and the interviewing officer on

44

whether the defendant was free to leave are irrelevant, and the reasonable person from whose perspective "custody" is defined is a reasonable innocent person. *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (quotations, citations, alteration, and emphasis omitted). Therefore, "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).

The Supreme Court has recently addressed the issue of custody for purposes of requiring the *Miranda* warnings and provided a non-exhaustive list of factors courts should consider:

> As used in our *Miranda* case law, "custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of "the objective circumstances of the interrogation," *Stansbury*[ ], 511 U.S. [at] 322-[ ]23, 325[ ] [ ], a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). And in order to determine how a suspect would have "gauge[d]" his "freedom of movement," courts must examine "all of the circumstances surrounding the interrogation." *Stansbury*, *supra*, at 322, 325[ ] (internal quotation marks omitted). Relevant factors include the location of the questioning, *see* [*Maryland v.*] *Shatzer*, [559 U.S. 98, 110-17][ ] [(2012)], its duration, *see Berkemer* [ ], 468 U.S. [at] 437-[ ]38[ ] [ ], statements made during the interview, *see* [*Oregon v.*] *Mathiason*, [429 U.S. 492], 495[ ] [(1977)]; *Yarborough* [ ],

541 U.S. [at] 665[ ]; *Stansbury*, *supra*, at 325[ ], the presence or absence of physical restraints during the questioning, *see* [ ] *Quarles*, 467 U.S. [at] 655[ ] [ ], and the release of the interviewee at the end of the questioning, *see* [ ] *Beheler*, 463 U.S. [at] 1122-[ ]23[ ] [ ].[9]

Determining whether an individual's freedom of movement was curtailed, however, is simply the first step in the analysis, not the last. Not all restraints on freedom of movement amount to custody for purposes of *Miranda*. We have "decline[d] to accord talismanic power" to the freedom-of-movement inquiry, *Berkemer*, *supra*, at 437[ ], and have instead asked the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*. "Our cases make clear . . . that the freedom-of-movement test identifies only a necessary and not a sufficient condition for Miranda custody." *Shatzer*, 559 U.S. at 112[ ].

*Howes v. Fields*, 132 S. Ct. 1181, 1189-90 (2012); *see also United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010) (explaining that "although a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment—and thus may be deemed to have been

---

9       The Eleventh Circuit also directs courts to consider whether a defendant was "[u]nambiguously advis[ed] ... that he [wa]s free to leave and [wa]s not in custody," *Brown*, 441 F.3d at 1347; and "whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled," *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006) (internal quotation marks omitted). The Court also should keep in mind that an "interviewee's 'status as a suspect, and the coercive environment that exists in virtually every interview by a police officer of a crime suspect,' does not automatically create a custodial situation." *United States v. Matcovich*, 522 Fed. Appx. 850, 851 (11th Cir. July 3, 2013) (quoting *United States v. Muegge*, 225 F.3d 1267, 1270 (11th Cir. 2000) (quotation marks omitted)).

AO 72A
(Rev.8/8
2)

'seized' by law enforcement—he will not necessarily be considered in 'custody' for Fifth Amendment purposes. . . . Rather, 'a free-to-leave inquiry reveals only whether the person questioned was seized.' . . . While 'seizure is a necessary prerequisite to *Miranda*, . . . a court must [also] ask whether . . . a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest.' ") (citations omitted).   The defendant bears the burden of establishing that he was in custody and that his statements were made in response to government questioning. *United States v. de la Fuente*, 548 F.2d 528, 533 (5ᵗʰ Cir. 1978) (holding that "if a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination."); *United States v. Charles*, 738 F.2d 686, 692 (5ᵗʰ Cir. 1984), *overruled on other grounds, United States v. Bengivenga*, 845 F.2d 593 (5ᵗʰ Cir. 1988).

In this case, Blocker did not establish that he was subject to *custodial* interrogation. In short, he did not demonstrate that the environment presented the same inherently coercive pressures as the type of station house questioning involved in *Miranda*. The questioning occurred at his home, in his kitchen. "[C]ourts are much less likely to find the circumstances custodial when the interrogation occurs in familiar

47

or at least neutral surroundings, such as the [defendant]'s home." *Brown*, 441 F.3d at 1348 (alteration and internal quotation marks omitted); *see also Luna-Encinas*, 603 F.3d at 882 (same).

He was told on several occasions that he did not have to answer questions, and that he was not under arrest or in custody. This advice has been held to be a "powerful factor" that "generally will lead to the conclusion that the defendant [wa]s not in custody." *Brown*, 441 F.3d at 1347. Although the agents initially had weapons drawn and may even have touched him physically to bring him out of the house, the record is bereft of any evidence that at the time of the questioning, any agents brandished firearms or physically touched him. *Howes*, 132 S. Ct. at 1189; *Luna-Encinas*, 603 F.3d at 881; *see also United States v. Maldonado*, 562 Fed. Appx. 859, 862 (11th Cir. Apr. 7, 2014). Although the record is ambiguous as to whether Blocker was initially handcuffed, it is clear that he was not handcuffed while questioned, and in any event, given that the burden is upon him to demonstrate that he was in custody, the ambiguity in the record as to any earlier restraints does not inure to his benefit.[10]

_____

[10]    Even if Blocker initially was handcuffed at the beginning the search warrant execution, courts have held that briefly handcuffing a defendant when a search warrant is being executed does not convert a subsequent interview into custodial questioning. *United States v. Dix*, No. 3:12-cr-7-TCB-RGV, 2013 WL 610219, at *5 (N.D. Ga. Jan. 29, 2013) (finding defendant was not in custody when officers entered

48

Although apparently Blocker was escorted to the bathroom for safety reasons, that fact does not point to a conclusion that Blocker was in custody; in *Maldonado*, where the defendant was escorted to the bathroom, the Eleventh Circuit held that since the defendant's movements were not  restricted and she was advised that she was free to leave, no custody was established.  *Id.*; *see also  Matcovich*, 522 Fed. Appx. at 852 (holding that " '[a]lthough an officer accompanied [Matcovich] throughout the house

_____

his store with weapons drawn to execute search warrant, handcuffed defendant, and escorted defendant outside where he was immediately un-handcuffed and then interviewed by two agents in an unmarked government truck for an hour and a half); *United States v. Toumasian*, No. 1:10-cr-291-TCB-JFK-3, 2011 WL 3798223, at *11 (N.D. Ga. July 19, 2011) (finding defendant was not in custody when six to ten officers used force to breach the door of his residence, had their weapons drawn when entering and securing the residence, had the defendant lie face down on the floor where he was handcuffed, and asked the defendant questions while he sat upright against a wall, still handcuffed, in the living room area while the search was being executed); *United States v. Parker*, No. 1:10-cr-176, 2010 WL 5313758, at *10 (N.D. Ga. Nov. 18, 2010) (King, M.J., *adopted by* 2010 WL 5313449 (N.D. Ga. Dec 17, 2010) (Carnes, J.) (concluding defendant was not "in custody" where law enforcement had firearms drawn briefly, handcuffed defendant, questioned the defendant in public, and used a laid back tone); *see also United States v. Beltran*, 367 Fed. Appx. 984, 988 (11th Cir. Mar. 4, 2010) (holding that defendant not in custody for *Miranda* purposes, when he was questioned by police officers regarding contents of his pocket and vehicle parked in driveway; although suspect was handcuffed, there were no significant pressures during questions that would have sufficiently impaired his ability to exercise his privilege against self-incrimination ), *cert. granted, judgment vacated on other grounds*, 562 U.S. 1128 (2011); *United States v. Thomas*, 193 Fed. Appx. 881, 886 (11th Cir. Aug. 16, 2006) (defendant not in custody even though she was handcuffed upon arrival of officers to her home, where officer testified he removed handcuffs before questioning and advised her she was not under arrest).

AO 72A
(Rev.8/8
2)

for safety reasons, he was free to' go outside to smoke and move about the house to get dressed and make coffee") (citation omitted).  This point does not tilt the balance towards custody.

Furthermore, although the evidence shows that at least during two parts of the encounter with the agents–when he initially was awakened and taken out of his house, and then when the agents advised him that they were going to seize his cell phone–Blocker was upset, frustrated and/or agitated, the record does not show that the agents used a tone of voice or raised their voices (other than during the initial entry) or otherwise engaged in coercive conduct such that, with regard to the questioning, Blocker was coerced or the agents' requests had to be obeyed or could be compelled. In fact, the reverse is true; the record demonstrates that Blocker was cooperative and compliant, and willing to answer questions, once he was informed of the nature of the agents' inquiries, and particularly when the questioning focused on Narbone's activities.

Finally, at the conclusion of the questioning and completion of the search, Blocker was not arrested until after the return of the present indictment. *Howes*, 132 S. Ct. at 1189; *Matcovich*, 522 Fed. Appx. at 852.

50

The only possible factor that points to custody is the length of the questioning, but the Court concludes that even if the questioning lasted up to four hours, this fact alone would not render the questioning custodial. *McDowell*, 250 F.3d at 1363 ("To the extent McDowell argues that the duration (approximately four hours) converted this inquiry into a custodial interrogation, we are unpersuaded."); *Muegge*, 225 F.3d at 1269 (holding that "interview lasting approximately two and one half hours" was non-custodial); *see also Howes*, 132 S. Ct. at 1193 (finding that despite interview that lasted between five and seven hours, prisoner was not in custody for *Miranda* purposes); *United States v. Bassignani*, 575 F.3d 879, 884 (9th Cir. 2009) (interview of two-and-a-half hours was not custodial). Thus, Blocker has not shown that he was in custody.

The Court is not persuaded that *Cavazos* is instructive at all in the current matter. The advice given to Blocker that he was free to leave distinguishes this case from that case. Cavazos was handcuffed as he was getting out of bed, and during a phone call to his brother, the call was monitored by the police. *Cavazos*, 668 F.3d at 192. Also, Cavazos was only advised that the questioning was a "non-custodial interview," which the *Cavazos* court held would not have imparted to the reasonable lay person that he could terminate the interview and leave. *Id.* at 195. No such comparable facts

51

demonstrating coercion exist in this case.  Blocker was not handcuffed while questioned; his conversations with third parties were not monitored; and he clearly was advised that he was not under arrest and did not have to answer the agents' questions. Thus, *Cavazos* is not persuasive in this case.

Regardless of whether Blocker was in custody or not, the government must prove that his statements were voluntary.  *United States v. Lall*, 607 F.3d 1277,  1285 (11th Cir. 2010).  The focus of the voluntariness inquiry is on whether the defendant was coerced by the government into making the statement:  "The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception."  *Colorado v. Connelly*, 479 U.S. 157, 170 (1986) (citation omitted).  The Court must consider the totality of the circumstances in assessing whether police conduct was "causally related" to the confession. *Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988).  This totality-of-the-circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of "an essentially free and unconstrained choice."  *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989).  Among the factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or

52

inducements by police.   *See, e.g., Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973); *United States v. Gonzalez*, 71 F.3d 819, 828 (11th Cir. 1996).  However, while the Eleventh Circuit has "enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent . . . ."  *Gonzalez*, 71 F.3d at 828 (citations omitted).  Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. *See Connelly*, 479 U.S. at 163 n.1; *Miller*, 838 F.2d at 1536; *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362-63 (11th Cir. 1984).   Isolated incidents of police deception, *id.*; *Frazier v. Cupp*, 394 U.S. 731, 739 (1969); and discussions of realistic penalties for cooperative and non-cooperative defendants, *see United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir. 1992); *United States v. Nash*, 910 F.2d 749, 753 (11th Cir. 1990), are normally insufficient to preclude free choice.

"Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).  However, courts have

53

recognized that non-custodial interviews are not nearly as "inherently coercive" as those that take place while a suspect is in custody. *Schneckloth*, 412 U.S. at 247; *Miranda*, 384 U.S. at 477-78; *accord United States v. White*, 846 F.2d 678, 689 (11th Cir. 1988) ("The same concerns do not exist when interrogation does not occur in custody."). The question is whether the officers used coercive tactics or took unlawful advantage of the situation to obtain the defendant's statements. *Cf. United States v. Jones*, 475 F.2d 723, 730 (5th Cir. 1973) (discussing consent to search following arrest).

The Court concludes Blocker's statements were voluntary. First, of course, Blocker did not address voluntariness in his brief, and although the government has the burden to show voluntariness, it appears as if Blocker has abandoned this issue. *Hudson v. Norfolk S. Ky. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) (Carnes, J.) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned.") (citations omitted).

Even if the issue was not abandoned, applying the relevant factors, first, Blocker had a degree in computer science, T22, which certainly demonstrates his intelligence for voluntariness purposes. Second, as noted, while the length of the questioning was between two and four hours, there is no indication that Blocker was unwilling to answer questions or gave answers to questions only as a result of the length of the questioning.

54

*See Martin v. Wainwright*, 770 F.2d 918, 925 (11th Cir. 1985) (finding statement voluntary even though it came after a five-hour interrogation in which one detective raised his voice at the defendant, cursed at him, discussed the death penalty, lied to him by stating a co-defendant had confessed, ignored his request to suspend questioning until the next day, and falsely assured him that the truth could not hurt him), *modified on denial of rehearing on other grounds*, 781 F.2d 185 (11th Cir. 1986).  In short, "he not worn down by . . . lengthy questioning. . . . *Fare v. Michael C.*, 442 U.S. 707, 727 (1979).

Third, at most, the physical force against Defendant was limited to grabbing him to remove him from the house and passing him back to the non-raiding agents, and no physical touching of Defendant occurred during the questioning.  To the extent he was not fully dressed at the time the agents arrived, there is no indication that he was deprived of the opportunity to get fully dressed or that his apparel or lack thereof contributed to his decision to talk to the agents.  Fourth, the evidence demonstrates that the nature of the interrogation was voluntary and that Blocker even volunteered to make a disc containing codes for the agents.  In fact, the record shows that although he was at first frustrated and anxious, once he was advised of the subject matter of the

55

investigation, particularly with regard to Narbone, Blocker demonstrated a willingness to answer the agents' questions.

Fifth, the record shows that the agents made no promises or inducements to get Blocker to talk and answer questions. Sixth, the record contains no trickery or deceit by the agents.

As a result, the Court concludes that Blocker's statements were voluntarily obtained.

For all of the above and foregoing reasons, the Court **RECOMMENDS** that Blocker's motion to suppress statements, [Doc. 36], be **DENIED**.

## IV.   *Conclusion*

The Court **RECOMMENDS** that Blocker's motion to suppress statements, [Doc. 36], and motion to suppress evidence, [Doc. 37], be **DENIED**. The Court has now ruled upon all of the motions referred to it, and has not been advised of any impediments to the scheduling of a trial. Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED AND CERTIFIED**, this the   29th   day of February, 2016.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/8
2)